**SO ORDERED.**

**SIGNED this 02 day of July, 2009.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:
DUSTIN DANE PHILLIPS,            Case No. 08-40435
           Case No. 7
     Plaintiff,

KANSAS MARK REYNOLDS,

     Plaintiff,

vs.            Adversary No. 08-7046

DUSTIN DANE PHILLIPS,

     Defendant.

**MEMORANDUM ORDER AND OPINION**

The issue the Court must ultimately decide is which of two young men who were involved in a bar fight in 2003 shall bear the financial burden for the serious injuries that one of them sustained. The party physically and mentally injured, the Plaintiff in this proceeding, seeks a determination that the damages he sustained cannot be discharged, pursuant to 11 U.S.C. §

523(a)(6),[1] in Dustin Phillips' bankruptcy. Phillips contends he has suffered enough by having to incur jail time and by not being able to work in the criminal justice field in which he received his college degree because of his conviction for Aggravated Battery, Reckless, Great Bodily Harm. He also claims that his actions were not willful and malicious because he was merely protecting his own safety, and that whatever debt he owes for the damages sustained by Plaintiff should be discharged so he can obtain the fresh start he sought when filing his bankruptcy petition.

This matter is under advisement after trial of Plaintiff's Complaint to Determine Dischargeability of Debt. This is a core proceeding over which this Court has jurisdiction to enter a final order.[2]

## I. FINDINGS OF FACT

In January 2003, Debtor/Defendant, Dustin Phillips, went to a bar to play pool with his boss and a friend of his boss, but then decided to meet his ex-girlfriend (Jessica) there, as well. The purpose of their meeting was to resolve an escalating argument between them surrounding money Jessica claimed he owed her from a prior furniture purchase. Jessica asked Plaintiff, Kansas Reynolds, and her current boyfriend (Brian) to go with her for support, and the men entered the bar shortly before she did. Phillips immediately recognized Brian, as Jessica had very recently introduced the two of them, and he thought it odd that Jessica had obviously asked these two men to accompany her, but had not entered with them. Reynolds and Brian sat together at a table and ordered drinks. Phillips and Reynolds had not met prior to that evening.

---

[1] This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[2] 28 U.S.C. § 157(b)(1)(jurisdiction to hear core proceedings) and § 157(b)(2)(I)) (action to determine dischargeability of debt is core proceeding), 28 U.S.C. § 1334 and 11 U.S.C. § 523(c).

2

When Jessica entered the bar, she went to a table close to where Phillips was standing, pretending she did not know Reynolds or Brian. Phillips asked Jessica why Reynolds and Brian had come with her. Since Jessica did not testify at trial, her exact reply is unknown; Phillips says she intimated that while they would not harm him while he was in the bar, that they might when he left. The statement Jessica gave to the police, which was admitted into evidence without objection, indicates that she told Phillips they were just there for her support, and would not harm him at all. Phillips told police that immediately before the altercation, Jessica taunted him by saying that she had engaged in a sexual relationship with Reynolds while she was dating Phillips. This would offer one explanation why Phillips would attack a man he had never before met.

Two bar keepers and a fellow patron ("disinterested witnesses"), all of whom did not know Phillips, Reynolds, or Jessica prior to that evening, and who have not had contact with any of them since, testified that during Phillips' conversation with Jessica, she left the table and went to the bar to get drinks. While she was at the bar, with her back to the tables, an altercation ensued between Phillips and Reynolds. According to consistent testimony of the disinterested witnesses who saw the events transpire, Phillips approached Reynolds from behind and swung the pool cue he had been holding, as if holding a baseball bat, in a downward motion. In doing so, he struck Reynolds in the head with the end of the cue, and Reynolds fell to the floor.

The disinterested witnesses also testified that after Reynolds fell to the floor, Phillips struck Reynolds at least once more, again in the head. Despite this testimony, Phillips insisted at trial that he only struck Reynolds once. No evidence corroborates his statement. Instead, a police officer testified that Reynolds suffered two separate lacerations, and Reynolds showed his two scars to the trial judge, indicating one on the back of his head and one above his right temple. Reynolds, who

3

still has no recollection of the events because of the head trauma he sustained, was unable to testify on this point.

Phillips claims he acted in self defense. He testified he attacked only after Reynolds stood, faced him, and began to draw from his pocket what Phillips thought might be a knife. Conversely, the disinterested witnesses all testified they never saw Reynolds standing preceding the attack, brandishing a knife, or provoking Phillips in any way.

Phillips testified he did not intend to strike Reynolds in the head, but merely intended to create a diversion to allow his escape from the bar. He admitted that he did intend to hit Reynolds, and that he swung with the intent to hit him, but thought the blow would actually be to his chest or arms. He stated he was frightened for his life and felt that swinging the pool cue was necessary for his personal safety. There was no evidence Phillips and Reynolds spoke to each other, or had an argument, before the attack, or that Reynolds saw the attack coming.

Disinterested witnesses testified that Reynolds was sitting at a table and Phillips attacked him from behind without provocation. There were approximately 20-25 other patrons in the bar at this time, including Phillips's boss. Thus, if Phillips actually did fear for his own safety, there were many people in the bar from whom he could have sought help. In addition, Phillips testified that his uncle was on the local police force (and on duty that night), and he might have been someone Phillips could have telephoned if he really just wanted to escape the bar without harm. Further, Phillips had just returned from the Olympic training village in Colorado, where he was training for the Olympics' competition in weightlifting, and thus he was presumably quite strong at the time of the altercation.

4

There was no objective evidence to suggest it was reasonable, for Phillips' safety, to strike Reynolds rather than leave the bar or seek help from others in the bar. And there certainly was no evidence to suggest that striking Reynolds while he was already on the floor was also done in self-defense.

Immediately after he struck Reynolds, Phillips fled the bar and ran to a friend's house in the neighborhood. Later, Phillips voluntarily surrendered to the police. The responding officer testified Phillips admitted he had hit Reynolds, but because he was so enraged, he could not remember if he had done so with the pool cue. A bar employee and the patron sitting at the bar both testified that at the time of the altercation, Debtor looked angry—not afraid—when he struck Reynolds.

By Phillips's own admission, the altercation resulted in serious physical and mental injuries to Reynolds. He suffered head trauma, and was hospitalized and underwent surgery to insert a metal plate in his skull. Plaintiff still suffers seizures, one of which hospitalized him immediately before the trial, as well as long and short term memory impairments and problems with concentration, all as a result of the injuries sustained six years ago. Plaintiff continues to be treated for these conditions. These conditions make it very difficult to obtain, or retain, employment.

In hindsight, Phillips admits he could have handled the situation better. He testified that he concluded he was in danger when he put together five facts: 1) Jessica had brought two men with her to the bar, when he thought it would be just the two of them; 2) Jessica effectively denying that she had brought them by acting as if she didn't know them; 3) Jessica saying the men wouldn't harm him while he was in the bar, intimating they might when he left the bar, 4) Jessica acting very edgy and nervous, and 5) Reynolds "threatening" him by standing and showing the handle of a knife. He

5

admits he got "tunnel vision" and that at the time, he thought these all added up to his safety being threatened.

Debtor was "criminally charged with Aggravated Battery, Intentional, Great Bodily Harm and with Battery, Intentionally causing physical contact with another for striking the Plaintiff."[3] Debtor ultimately entered a *nolo contendere* plea to the charge of Aggravated Battery, Reckless, Great Bodily Harm."[4]

Reynolds brought a civil tort action against Phillips, but through an error in the state court, a judgment was never entered against him. Phillips, who now contends that he did not receive proper service of summons in that action, defaulted in that proceeding. In the state court action, Reynolds is seeking total economic and non-economic damages of $795,798.49, punitive damages of $100,000, and attorney fees of $5,000, for a total award of $900,798.49. The issue before this Court is whether that judgment, if ever entered, is dischargeable in Phillips' bankruptcy.

## II. ANALYSIS

### A. Standard of Review

The burden of proof rests with the party opposing the discharge. Thus, in this case, the burden of proof, by a preponderance of the evidence, is on Reynolds.[5] Discharge provisions are

---

[3] Pretrial Order, Stipulation 6(A). (Doc. 47).

[4] *Id.* at 6(D). K.S.A. § 21-3414(2).

[5] *See Grogan v. Garner,* 498 U.S. 279, 291 (1991) (holding that preponderance of the evidence standard, not clear and convincing standard, applies to all exceptions to discharge). *See also Busch v. Hancock (In re Busch)*, 369 B.R. 614, 623 (10th Cir. BAP 2007).

strictly construed against the objecting creditor and, because of the fresh start objectives of bankruptcy, doubt is to be resolved in favor of debtors.[6]

### B. Reynolds met his burden of proving that Phillips engaged in conduct that would render his debt non-dischargeable pursuant to § 523(a)(6).

Reynolds claims that Phillips caused a willful and malicious injury to him, and as a result, any damages he can prove in the pending state court tort litigation should not be dischargeable pursuant to § 523(a)(6). Section 523(a)(6) provides an exception to discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." This section reflects the policy consideration that certain conduct is so socially reprehensible that the resulting indebtedness is not worthy of discharge.[7]

In 1998, the Supreme Court clarified, in *Kawaauhau v. Geiger*,[8] that § 523(a)(6) only applies to a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. In other words, debts arising from reckless or negligently inflicted injuries are not within the exception of § 523(a)(6). The Supreme Court explained that this meant the debtor must have intended the consequences of the act he or she performed, not simply the act itself.[9] That said, if a debtor actually knows, or should reasonably foresee, that his voluntary conduct will result in injury,

---

[6] *In re Colo. Judicial Dep't v. Sweeney (In re Sweeney)*, 341 B.R. 35, 40 (10th Cir. BAP 2006) (citing *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997)); *Miller v. J.B. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998).

[7] 3 W. Norton, Bankruptcy Law and Practice 3d § 57.44, p. 126 (2009).

[8] 523 U.S. 57, 60-64 (1998).

[9] *Id.* at 61-62. *See also Horn v. Hazard (In re Hazard)*, 166 B.R. 145, 147 (Bankr. E.D. Mo. 1994) (citing W. Prosser, Law of Torts 32 (4th ed. 1971) (stating "a person should be deemed to have intended a result when 'a reasonable person in ... [his] position would believe ... [such a] result was substantially certain to follow.'")

7

the conduct is deemed willful and malicious.[10] And as noted by the Court of Appeals for the Tenth Circuit, without proof of *both* a willful act and a malicious injury, an objection to discharge under § 523(a)(6) must fail.[11] A wrongful act done intentionally, which necessarily produces harm or that has a substantial certainty of causing harm, and is without just cause or excuse, is "willful and malicious" within the meaning of § 523(a)(6).[12]

Applying this settled law to the facts, the Court finds that Debtor intended the consequences of the act he performed, not simply the act itself.[13] In other words, the Court finds that Phillips intended to hurt Reynolds on that January 2003 evening. Phillips was angry, as he later admitted to the police,[14] and he struck Reynolds with such force, two separate times, that a reasonable person could have predicted would have caused injury. All witnesses concur that Phillips held the pool stick like a baseball bat, and swung it in a downward motion while Reynolds' back was to him. And in light of Phillips' recent Olympic-level training as a weightlifter, Phillips had to know that such a swing would hit Reynolds with force.[15]

---

[10]*Davis v. Williams (In re Williams)*, 173 B.R. 912 (Bankr. W.D. Ark. 1994); 4 Collier on Bankruptcy ¶ 523.12[2], p. 523-94 (15th ed. rev. 2009).

[11]*Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (emphasis in original).

[12]4 Collier at ¶ 523.12[2] (noting that liability arising from assault or battery is generally considered as founded upon a willful and malicious injury and is therefore within the exception); *Hixson v. Hixson (In re Hixson)*, 252 B.R. 195, 198 (Bankr. E.D. Okla. 2000) (noting that debts arising from assault and battery are considered willful injuries under § 523(a)(6) absent legal justification or excuse).

[13]*Kawaauhau.*523 U.S. at 61-62.

[14]Exhibit 2, page 4.

[15]*See Matter of Rowland*, 1988 WL 73431 at *3 (D.N.J.,1988) (affirming bankruptcy court's determination that the debtor's punching of Coughlin was a "willful and malicious injury" within the meaning of § 523(a) (6), as "it is readily apparent that when someone swings a fist at someone damages are going to flow.").

8

Although the Court might have been able to believe that Phillips did not intend to strike Reynolds in the head the first time, such doubt evaporated when the disinterested witnesses testified that he hit Reynolds in the head a second time when Reynolds was already on the floor. Even Phillips admitted, in his closing argument,[16] that he did not intend to hurt Reynolds "that bad." This statement, along with the rest of the evidence, leads to the inescapable conclusion that he fully intended to strike Reynolds—the action was willful. The force of the blows, coupled with the fact one of them occurred when Reynolds was injured and on the bar floor, satisfies the malicious element, unless Phillips can show that he had just cause for delivering the blows.

The Court cannot find that Phillips' actions were with just cause. The Court does not find Philips' testimony that he struck Reynolds because of a reasonable fear for his safety to be credible. Under Kansas law, K.S.A. § 21-3211, "[a] person is justified in the use of force against another person when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force." Here, there was no evidence of imminent use of unlawful force against Phillips. The disinterested witnesses, who had the opportunity to see the events leading up to the assault, confirmed that Reynolds was not poised to attack Phillips.

Instead, Reynolds was sitting with his back to Phillips, not approaching him, at the time Phillips struck him. Because of that, Phillips could have asked the employees of the bar to allow him to leave from another door (or the front door), could have asked his boss[17] to escort him to his

---

[16]Phillips represented himself in the dischargeability trial.

[17]Debtor testified that he thought his boss had already left the bar at the time of the altercation, but other evidence presented at trial showed that not only was his boss still there, but helped break up the fight and escort Phillips from the bar afterwards. A reasonable person would not likely have forgotten that detail, and Debtor's lack of candor on this detail was one of several areas of his testimony that led this Court to discount his credibility.

9

car or home, could have called the police, generally, or his uncle specifically (since his uncle was a policeman and apparently was on duty that night), or asked others in the bar to help him safely leave the bar. Phillips opted in favor of attacking, instead of using one of those many alternatives to attack. That was not reasonable under all the circumstances.

Although Phillips may well not have intended for Reynolds to be as seriously hurt as he ultimately was, he clearly intended to hurt Reynolds that night. And although at trial it was apparent that Phillips had matured in the six years since this altercation, and said he regretted his actions—at least as much because they have resulted in the loss of income-earning potential for himself as a result of the felony on his record—as for Reynolds' long-term injuries, his expressed regret comes far too late for Mr. Reynolds. As between Debtor receiving a full financial fresh start after his bankruptcy, and Mr. Reynolds being compensated for injuries that Phillips willfully and maliciously caused him, the choice is not a difficult one. Debtor should not, and will not, receive a discharge of such debt. Although Mr. Phillips may not be financially able to repay any debt that a state court determines may be owed from these events, this Court finds that Mr. Reynolds should at least have the opportunity to try to obtain recompense for those injuries.

## III. CONCLUSION

The Court conducted a trial of this matter, which permitted the Court to judge the credibility of the numerous witnesses. Critical to this Court's findings was the consistent testimony from witnesses who had no interest in the outcome of the proceedings, which testimony frequently conflicted with Debtor's testimony on material facts. The testimony of the disinterested witnesses, coupled with the witness statements admitted into evidence by stipulation, was more credible than

the self-serving testimony of Mr. Phillips, who obviously would rather get on with his life without the continuing burden of the ongoing state court litigation.

Accordingly, after applying the relevant law to these facts, the Court has found that Plaintiff proved, by a preponderance of the evidence, that the debt in question was the result of a willful and malicious injury by Debtor, as required by § 523(a)(6). Debtor did not demonstrate that his actions were reasonably in self-defense. For these reasons, the Court finds that judgment should be entered in favor of the Plaintiff, and against Defendant, finding that any debt found to be owed to Plaintiff arising from the altercation is not dischargeable.

**IT IS, THEREFORE, BY THIS COURT ORDERED** that judgment shall be entered in favor of Plaintiff on his Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523(a)(6).[18]

# # #

---

[18] Doc. 1.